913 F.2d 533
 Donald E. YELDELL and Rita F. Yeldell, Appellees,
v.
David TUTT, Gloria Tutt, Southern Capitol Enterprises, Appellants.
Capitol American Life Insurance Company.
Donald E. YELDELL and Rita F. Yeldell, Appellees,
v.
David TUTT, Gloria Tutt, Southern Capitol Enterprises,
Capitol American Life Insurance Company, Appellant.
Donald E. YELDELL and Rita F. Yeldell, Appellants,
v.
David TUTT, Gloria Tutt, Southern Capitol Enterprises and
Capitol American Life Insurance Company, Appellees.
 Nos. 89-2458, 89-2459 and 89-2530.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 9, 1990.
Decided Sept. 7, 1990.
 
 Ted Boswell, Bryant, Ark., for appellants Tutt and Southern Capitol Enterprises.
 Norwood Phillips, El Dorado, Ark., for appellant Capitol American Life.
 Billy Hubbell, Crossett, Ark., for appellees.
 Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Donald E. and Rita F. Yeldell, previously employed by David and Gloria Tutt and Southern Capitol Enterprises, were awarded damages for a contract claim based upon insurance renewal commissions, and for a defamation claim based upon the Tutts' statements following the Yeldells' resignations from Southern Capitol. The Yeldells also recovered a judgment against Capitol American Life Insurance Company on these claims; the district court,[1] however, held that Capitol American was entitled to indemnification by the Tutts and Southern Capitol. On appeal, the Tutts and Southern Capitol argue that the district court: (1) lacked subject-matter and personal jurisdiction over the Tutts and Southern Capitol; (2) erred in failing to grant either a judgment notwithstanding the verdict or a new trial because there was no evidence to support the jury's conclusion that the Tutts acted with actual malice, and because the Tutts' communications were protected by qualified privilege; and (3) erred in failing to grant either a judgment notwithstanding the verdict or a new trial because there was no evidence that the Yeldells had sustained compensatory damages. Capitol American argues on appeal that the court erred: (1) in submitting the issue of whether the Tutts and Southern Capitol were independent contractors for or employees of Capitol American to the jury; and (2) in holding that the contractual provision pertaining to diversion of renewal commissions was void under Ohio law. On cross-appeal, the Yeldells urge that the court erred in determining the amount of damages awarded on their defamation claim. We affirm the judgment of the district court in all respects.
 
 
 2
 David and Gloria Tutt were the sole owners of Southern Capitol Enterprises, a Louisiana insurance agency. Donald and Rita Yeldell had been employed by Southern Capitol during three different time periods in the past and had a close personal relationship with the Tutts. Southern Capitol was under contract with Capitol American Life Insurance Company to market Capitol American's insurance policies. When the Tutts returned from vacation in March 1987, they found that the Yeldells and another Southern Capitol employee, David Henry, had resigned from employment. Later that summer, a representative of Equifax Services contacted the Tutts for information about the Yeldells' employment with Southern Capitol. Based upon the information shared by the Tutts, Equifax issued a report on the Yeldells which stated that when the Tutts returned from vacation, they found that the Yeldells had signed unauthorized checks and expense approvals, had removed property from the Southern Capitol premises without authorization, had interfered with other employees' job duties, and had held unauthorized meetings with other personnel. The report described the Yeldells as dishonest and unreliable.
 
 
 3
 After this Equifax report was submitted to Appalachian National Life Company, a company with which the Yeldells were seeking employment, David Tutt called Bob Collier, an Appalachian representative, and told him that the Yeldells had disrupted the Tutts' office the week before their resignations, had persuaded David Henry to resign, and had intended to leave the office vacant when the Tutts returned from vacation. Tutt further stated that the Yeldells had signed unauthorized checks and had taken confidential information from the office. In addition, Tutt informed Thomas Fullerman, his contact at Capitol American, that the Yeldells had written unauthorized expense checks, had taken materials from the office, had interfered with other employees' job duties, had held unauthorized meetings, and had defamed the character of Southern Capitol.
 
 
 4
 The Yeldells brought this diversity action against the Tutts, Southern Capitol, Equifax, and Capitol American. They alleged that the statements were false and caused them reputational and emotional injury. They also brought a breach of contract claim against Capitol American asserting that a contractual provision pertaining to diverting renewal commissions from the Yeldells' account to the Tutts' and Southern Capitol's accounts was void. During trial, Equifax and the Yeldells reached a settlement agreement. After a jury trial, Donald Yeldell was awarded past-due expenses from Southern Capitol in the amount of $84.69; vested renewal commissions from Capitol American in the amounts of $10,371, with Capitol American entitled to indemnification from Southern Capitol; and compensatory damages of $75,000 and punitive damages of $91,200 from the Tutts, Southern Capitol, and Capitol American, with Capitol American entitled to indemnification from Southern Capitol and the Tutts. Rita Yeldell was awarded vested renewal commissions from Capitol American in the amount of $6,819, with Capitol American entitled to indemnification from Southern Capitol; and compensatory damages of $50,000 and punitive damages of $60,800 from the Tutts, Southern Capitol, and Capitol American, with Capitol American entitled to indemnification from Southern Capitol and the Tutts.
 
 
 5
 The court denied the defendants' post-trial motions requesting a judgment notwithstanding the verdict or, alternatively, a new trial or remittitur. The court ruled that the jury verdict necessarily included a finding that the Tutts had made false and defamatory statements about the Yeldells, that the statements were made with knowledge of their falsity or with reckless disregard as to their falsity, and that they were made with ill will and the desire to injure the Yeldells. The court observed that the parties had presented conflicting evidence but that the jury had apparently believed the Yeldells' version of the facts. After discussing the relevant evidence, the court concluded that the jury's findings were supported by a permissible view of the evidence. This appeal followed.
 
 I.
 
 6
 The Tutts and Southern Capitol first argue that the district court lacked both subject-matter and personal jurisdiction to hear this suit.
 
 A.
 
 7
 They argue that the court lacked subject-matter jurisdiction because there was not complete diversity of citizenship between the plaintiffs and the defendants. The parties agree that the Tutts and Southern Capitol are Louisiana citizens; it is the citizenship of the Yeldells that is disputed. The Tutts assert that the Yeldells were citizens of Louisiana, not Arkansas, when suit was filed on March 2, 1988. The Yeldells admit that they were Louisiana citizens when the cause of action arose and that they moved back to Louisiana for a brief time before filing suit. They insist, however, that they were citizens of Arkansas at the time of filing suit and at the time of trial.
 
 
 8
 We are somewhat disadvantaged because subject-matter jurisdiction was not challenged in the district court, and the court made no findings on this issue. Questions of subject-matter jurisdiction, of course, may be raised at any time and may not be waived. Insurance Corp. of Ireland v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). A court, including an appellate court, may raise the issue sua sponte and, indeed, the court has the duty to do so if the record suggests jurisdiction is lacking. Id.
 
 
 9
 Well-established principles guide our consideration of this jurisdictional issue. The Yeldells, as the parties seeking a federal forum, have the burden of establishing jurisdiction by a preponderance of the evidence. Blakemore v. Missouri Pac. R.R., 789 F.2d 616, 618 (8th Cir.1986). "[D]iversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff." Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978). The existence of diversity of citizenship is determined at the time the suit is instituted, and not when the cause of action arose. Smith v. Snerling, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957); Blakemore, 789 F.2d at 618.
 
 
 10
 For purposes of diversity jurisdiction, the terms "domicile" and "citizenship" are synonymous. Rodriguez-Diaz v. Sierra-Martinez, 853 F.2d 1027, 1029 (1st Cir.1988); C. Wright, A. Miller & E. Cooper, 13B Federal Practice and Procedure Sec. 3612, at 526 (2d ed. 1984). To establish domicile, an individual must both be physically present in the state and have the intent to make his home there indefinitely. Blakemore, 789 F.2d at 618; J. Moore, J. Lucas, H. Fink, D. Weckstein & J. Wicker, 1 Moore's Federal Practice p 0.74[3.-1] (1990). Intention to remain there permanently, however, is not necessary. Blakemore, 789 F.2d at 618. Once an individual has established his domicile, he remains domiciled there until he legally acquires a new domicile. C. Wright, A. Miller & E. Cooper, supra, Sec. 3612, at 535.
 
 
 11
 With these principles in mind, we search the record as a whole to determine whether the Yeldells met their burden on the jurisdictional issue. A long-established rule states that "[i]t is sufficient to support the jurisdiction of a federal court that the facts requisite to confer it appear in any part of the record, or are the necessary consequences of the facts stated in the pleadings or the findings of the court." Myers v. Hettinger, 94 F. 370, 372 (8th Cir.1899). The complaint clearly alleged that the Yeldells were residents of Wilmot, Arkansas, that the Tutts were residents of Baton Rouge, Louisiana, and that Southern Capitol was a Louisiana corporation with its principal place of business in Baton Rouge. The answer filed by the Tutts and Southern Capitol stated that they were without knowledge or information as to the truth of the allegations of the Yeldells' residence and therefore denied those allegations, but admitted the allegations concerning the Tutts' and Southern Capitol's residences. The answer asserted that Arkansas lacked personal jurisdiction over the Tutts and Southern Capitol, but did not raise the issue of subject-matter jurisdiction.
 
 
 12
 The evidence presented at trial was as follows: The Yeldells lived in Louisiana while employed by the Tutts but moved to Little Rock, Arkansas immediately after resigning from employment with the Tutts on March 6, 1987. The Yeldells contracted with Appalachian National Life Insurance Company to sell insurance and recruit agents in Arkansas. They attended insurance classes in Arkansas to obtain Arkansas insurance licenses. They later became licensed in Arkansas. The Yeldells formed an Arkansas corporation named Insurance Benefits Services to start their own agency in Little Rock. They obtained stationery and business cards that identified Don Yeldell as Managing General Agent of Appalachian National and listed a Little Rock address. They also sent mailers recruiting prospective insurance agents that bore the same Little Rock address. The document that provided the IRS employer identification number listed a Little Rock address.
 
 
 13
 Around August 2, 1987, the Yeldells temporarily left Arkansas to return to Louisiana. Approximately five months later, the Yeldells moved to Wilmot, Arkansas and resided there until the trial. From March 1988, when the Yeldells filed suit, until December 1988, Rita Yeldell worked in a restaurant in Wilmot.
 
 
 14
 We are convinced that the Yeldells met their burden of proof on the jurisdictional issue. The crucial date is March 2, 1988, the date the complaint was filed. An abundance of evidence establishes that the Yeldells moved to Little Rock immediately after leaving the Tutts' employment and intended to remain in Arkansas to establish themselves in the insurance business. Thus, the Yeldells satisfied both elements of the domicile test.
 
 
 15
 The Yeldells' brief return to Louisiana before filing suit does not alter our conclusion. That temporary relocation does not in any way diminish the Yeldells' intention to remain in Arkansas indefinitely at the time of filing. As we have already stated, to establish a domicile does not require the intention to remain there permanently. Moreover, there was evidence that the Yeldells regarded their return to Louisiana as a temporary condition necessitated by financial considerations and that they continued to attempt to establish an insurance business in Arkansas.
 
 
 16
 Our search of the record reveals that there is substantial evidence that the Yeldells were domiciled in Arkansas at the time of filing suit and there is no significant evidence to the contrary. Accordingly, we hold that the Yeldells satisfied their burden of proof in establishing diversity jurisdiction and were properly in a federal forum.
 
 B.
 
 17
 The Tutts and Southern Capitol also assert that the district court lacked personal jurisdiction over them because their contacts with Arkansas failed to satisfy either the constitutional minimum contacts standard or the Arkansas long-arm statute, Ark.Code Ann. Sec. 16-4-101 (Michie 1987). We do not consider this point because we are convinced that the Tutts and Southern Capitol waived this argument before their appeal.
 
 
 18
 The Tutts and Southern Capitol urge that they preserved their right to raise this defense by denying the existence of personal jurisdiction in their answer to the Yeldells' complaint. After filing their answer, however, they failed to reassert the issue of personal jurisdiction until this appeal. As support for their position, the Tutts and Southern Capitol rely on Rule 12(h) of the Federal Rules of Civil Procedure, which provides that the defense of lack of personal jurisdiction is waived if not made by motion or included in a responsive pleading. We believe, however, that "this rule sets only the outer limits of waiver; it does not preclude waiver by implication." Marquest Medical Prods. v. EMDE Corp., 496 F.Supp. 1242, 1245 n. 1 (D.Col.1980). Asserting a jurisdictional defect in the answer did "not preserve the defense in perpetuity." Burton v. Northern Dutchess Hosp., 106 F.R.D. 477, 481 (S.D.N.Y.1985). This defense "may be lost by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct." Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 168, 60 S.Ct. 153, 155, 84 L.Ed. 167 (1939). While the Tutts literally complied with Rule 12(h) by including the jurisdictional issue in their answer, they did not comply with the spirit of the rule, which is "to expedite and simplify proceedings in the Federal Courts." C. Wright & A. Miller, 5A Federal Practice and Procedure Sec. 1342, at 162 (2d ed. 1990) (quoting E.I. Du Pont De Nemours & Co. v. Dupont Textile Mills, 26 F.Supp. 236, 236 (M.D.Pa.1939)).
 
 
 19
 This court, in Alger v. Hayes, 452 F.2d 841 (8th Cir.1972), held that the defendant had waived his defense of lack of personal jurisdiction because his conduct did "not reflect a continuing objection to the power of the court to act over the defendant's person." Id. at 844. We rejected the defendant's attempt to maintain his jurisdictional objection while awaiting the outcome of the trial. "We think this plays 'fast and loose' with the power of the federal court and we disavow tolerance of such a procedure." Id. at 845. Other courts have also taken this view. In Datskow v. Teledyne, Inc., Continental Products Division, 899 F.2d 1298 (2d Cir.1990), the court stated that "[a] delay in challenging personal jurisdiction by motion to dismiss has resulted in waiver, even where, as here, the defense was asserted in a timely answer." Id. at 1303 (citations omitted). See, e.g., Marcial Ucin, S.A. v. SS Galicia, 723 F.2d 994, 996-97 (1st Cir.1983); Reliable Tire Distrib. v. Kelly Springfield Tire Co., 623 F.Supp. 153, 155-56 (E.D.Pa.1985); Marquest Medical Prods., 496 F.Supp. at 1244-46.
 
 
 20
 Here, the Tutts and Southern Capitol provided no more than a bald assertion in their answer that the court lacked personal jurisdiction over them. They then participated in discovery, filed various motions, participated in a five-day trial, and filed post-trial motions, all without raising the issue of personal jurisdiction or requesting a ruling on it. Now, upon appeal, they seek to assert this defense. We are faced with a record that contains no consideration of this issue; this is the type of situation the Federal Rules of Civil Procedure seek to avoid. We do not believe that the Tutts and Southern Capitol should be permitted to benefit by such tactics. Although the Tutts have not formally consented to this suit, we hold that their conduct in delaying consideration of this threshold issue manifests an intent to submit to the court's jurisdiction.
 
 II.
 
 21
 The Tutts and Southern Capitol advance several arguments in support of their contention that the court erred in failing to enter a judgment notwithstanding the verdict or to grant a new trial. We will consider each of these in turn.
 
 A.
 
 22
 They first argue that punitive damages should not have been awarded because of the lack of evidence of malice. According to the Tutts, they harbored no ill will toward the Yeldells and made only accurate statements about the Yeldells' work record.
 
 
 23
 In considering a challenge to the sufficiency of the evidence in a diversity case, we apply the same standard used by the state in which the district court sits. Bastow v. General Motors Corp., 844 F.2d 506, 508 (8th Cir.1988). Accordingly, we must view the evidence in the light most favorable to the verdict and determine "whether there is substantial evidence to support the jury verdict." Weber v. Bailey, 302 Ark. 175, 176, 787 S.W.2d 690, 691 (1990). We must give "the verdict the benefit of all reasonable inferences permissible under the proof." Schaeffer v. McGhee, 286 Ark. 113, 114, 689 S.W.2d 537, 538 (1985).
 
 
 24
 Under Arkansas law, to support an award of punitive damages in a defamation action, the jury must find that the defamatory statements were made with ill will, malice, or bad intent. Flynn v. McIlroy Bank & Trust Co., 287 Ark. 190, 194-95, 697 S.W.2d 114, 116 (1985); Dillard Dep't Stores v. Felton, 276 Ark. 304, 311, 634 S.W.2d 135, 138 (1982). The jury may infer malice from the circumstances of the case. Id. The jury instruction properly stated the law on punitive damages.[2] After reviewing the record in the light most favorable to the verdict, we are satisfied that substantial evidence supports the jury verdict.
 
 
 25
 There was evidence that Gloria Tutt told the Equifax representative that Rita Yeldell had been "terminated along with her husband because of fraud doings that she and her husband got involved in when the owner of the company was away." At trial, it was undisputed that the Yeldells were not terminated; rather, they quit their jobs. Moreover, as stated by the district court, the jury could have found from the evidence that there were no such "fraud doings." David Tutt stated that he had "learned [the Yeldells] had taken action to cause harm to his company by signing unauthorized checks and expenses and removing materials and other items without authorization off of the premises." There was evidence that authorization for expense checks was unnecessary and evidence from which the jury could conclude that the Yeldells had not removed property without authorization.
 
 
 26
 There was testimony that David Tutt said that he would starve the Yeldells out of business, that they would never work anywhere again, and that he had more money than they and could outlast them in court. Similar comments were made to other individuals, including calling the Yeldells "thieves." We need not recite all of the evidence supporting the verdict.
 
 
 27
 The jury could reasonably infer from the evidence at trial that the Tutts intended to injure the Yeldells. We are satisfied, therefore, that substantial evidence supports the jury's acceptance of the Yeldells' version of the facts and its finding of malice.
 
 B.
 
 28
 The Tutts next argue that their communications were protected by qualified privilege. Arkansas law provides a qualified immunity for "statements made in good faith with reasonable grounds for believing them to be true on a subject matter in which the author has a public or private duty to a person having a corresponding duty." Dillard Dep't Stores, 276 Ark. at 309, 634 S.W.2d at 137. The Tutts contend that they had a duty to inform Bob Collier, the Yeldells' prospective employer; Don Roark, a former manager of Southern Capitol; Thomas Fullerman, the contact at Capitol American; and the Equifax representative, of the conditions surrounding the Yeldells' departure from Southern Capitol.
 
 
 29
 We reject this argument. While the qualified privilege is not necessarily destroyed simply because the defendant felt ill will toward the plaintiff, Navorro-Monzo v. Hughes, 297 Ark. 444, 450, 763 S.W.2d 635, 638 (1989), the privilege "must be exercised in a reasonable manner and for a proper purpose." Dillard Dep't Stores, 276 Ark. at 308, 634 S.W.2d at 137. "[I]f the person making the statement steps outside the bounds of the privilege or abuses the privilege, the qualified privilege is lost." Navorro-Monzo, 297 Ark. at 450, 763 S.W.2d at 637. We believe that substantial evidence at trial indicated that the Tutts stepped beyond the bounds of the privilege. The evidence of malice suggests that the Tutts acted with the primary purpose of injuring the Yeldells, and not because of a duty to inform. The court instructed the jury on the law of qualified privilege. Evidence supports the jury's conclusion that the privilege was abused here.
 
 C.
 
 30
 The Tutts and Southern Capitol contend that no evidence established that the Yeldells sustained compensatory damages. Specifically, they assert that there was insufficient evidence of reputational harm. Under Little Rock Newspapers, Inc. v. Dodrill, 281 Ark. 25, 660 S.W.2d 933 (1983), absent a showing of actual malice, proof of damage to reputation is required for compensatory damages. Id. at 32, 660 S.W.2d at 937. We are satisfied, however, that the Yeldells met their evidentiary burden.
 
 
 31
 A representative of the Appalachian National Life Insurance Company testified that the company had been willing to advance commissions on policies to the Yeldells before release of the Equifax report that defamed the Yeldells. After the report reached Appalachian, however, it would not advance commissions to the Yeldells. This indicates that the defamatory statements damaged the Yeldells' reputation. We believe that this is sufficient proof of reputational harm. See Note, Little Rock Newspapers, Inc. v. Dodrill: Proving Damage to Reputation in a Libel Action, 38 Ark.L.Rev. 899, 910-911 (1985).
 
 
 32
 Compensatory damages also may be recovered based upon a finding of actual malice alone. See Dodrill, 281 Ark. at 32, 660 S.W.2d at 937. To make a statement with "actual malice" is to make it with "knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). This definition was incorporated into the jury instruction on punitive damages.[3] The jury's award of punitive damages necessarily included a finding of actual malice.
 
 D.
 
 33
 Finally, the Tutts argue that damages for mental suffering should not have been awarded. They rely upon Dodrill for the proposition that damages for mental suffering may not be recovered without proof of reputational harm. See Dodrill, 281 Ark. at 32, 660 S.W.2d at 937. Since we have just concluded that the Yeldells established proof of reputational injury, we need not address this argument.
 
 III.
 
 34
 We now turn to Capitol American's arguments. The jury found Capitol American vicariously liable for the acts of the Tutts and Southern Capitol based upon an employment relationship. Capitol American first argues that the court erred in submitting the issue of whether the Tutts and Southern Capitol were independent contractors or employees of Capitol American to the jury. This argument is essentially a challenge to the sufficiency of the evidence. As previously stated, we must view the evidence in the light most favorable to the verdict, give the verdict the benefit of all reasonable inferences, and determine "whether there is substantial evidence to support the jury verdict." Weber, 302 Ark. at 176, 787 S.W.2d at 691. See supra section II.A.
 
 The court instructed the jury as follows:
 
 35
 If one person has the right to control the actions of another at a given time, the relationship of master and servant may exist at that time, even though the right to control may not actually have been exercised.
 
 
 36
 An independent contractor is one who, in the course of his independent occupation, is reponsible [sic] for the performance of certain work, uses his own methods to accomplish it and is subject to the control of the employer only as to the result of the work. In contrast to a servant, any fault of an independent contractor is not charged to his employer.
 
 
 37
 Capitol American contends that Southern Capitol and the Tutts are each independent contractors for whose conduct it is not responsible. Capitol American has the burden of proving that Southern Capitol and the Tutts were independent contractors.
 
 
 38
 In deciding whether Southern Capitol and the Tutts were independent contractors or servants of Capitol American, you are to look at the actual nature of the relationship between the parties and the objects and purposes of that relationship. A declaration in a contract that no principal/agent, master/servant or employer/employee relationship is created by the contract is evidence which you may consider, but such a declaration does not by itself foreclose the issue. You must decide whether Southern Capitol and the Tutts were servants or independent contractors of Capitol American Life as those roles are defined in these instructions based upon all of the relevant evidence bearing upon that issue.
 
 
 39
 Tutts' and Southern Capitol's App., Vol. V., at 1240-41. This instruction correctly stated the law. See Carter v. Ward Body Works, 246 Ark. 515, 517-18, 439 S.W.2d 286, 287-88 (1969).
 
 
 40
 Capitol American admitted during trial that the Tutts were Capitol American employees in its objections asserting attorney-client privilege to protect statements made by the Tutts to Capitol American's in-house counsel. Moreover, David Tutt had a contract with Capitol American that authorized him to appoint subordinates, subject to Capitol American's approval, and that made him liable to Capitol American for the actions of subordinates. Tutt agreed to solicit insurance applications in accordance with Capitol American's instructions. Tutt and his subordinates agreed to report to Capitol American as directed, and to obtain prior approval for advertisements referring to Capitol American.
 
 
 41
 Capitol American reserved the right to change the amount of renewal commissions on its policies. All insurance premiums were Capitol American's property, and Tutt agreed to remit promptly all premiums to Capitol American in accordance with its regulations. Tutt agreed not to compete with Capitol American and to refrain from serving as an agent or employee of other entities offering the same services. Tutt served as Capitol American's national sales manager to recruit and train sales representatives. Capitol American provided him with its letterhead stationery; it also authorized him to speak on Capitol American's behalf.
 
 
 42
 Viewing the evidence in the light most favorable to the verdict, we conclude that there was substantial evidence the Tutts were employees of Capitol American.
 
 IV.
 
 43
 Capitol American's final argument is that the court erred in holding that the contractual provision pertaining to diversion of renewal commissions was void under Ohio law. Under the Capitol American Marketing Agreement, the Yeldells were entitled to renewal commissions on policies already sold unless they violated the terms of the agreement. Capitol American claimed that the Yeldells had violated the condition that they not use Capitol American's marketing methods "to engage in any life, annuity or accident and health insurance business." The court ruled that the Yeldells had violated this condition. This was not determinative of the issue, however, because the court further ruled that, under Ohio law, the provision was void as an unreasonable restraint on trade.
 
 
 44
 The court acknowledged that, under Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), it was obligated to refer to Arkansas choice of law rules to select the applicable substantive law. Arkansas will enforce contractual forum selection clauses if the designated forum has sufficient contacts with the controversy. Arkansas Appliance Distrib. Co. v. Tandy Elecs., 292 Ark. 482, 485-86, 730 S.W.2d 899, 900 (1987). The contract in issue here provided that Ohio law would control. Since Capitol American's principal place of business was in Ohio, the court properly held that Ohio law would govern.
 
 
 45
 Capitol American argues that the district court misapplied Ohio law because Ohio law requires that void contractual provisions be modified, when possible, to make them enforceable. In Raimonde v. Van Vlerah, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975), the Ohio Supreme Court adopted the "rule of 'reasonableness,' ... to determine, on the basis of all available evidence, what restrictions would be reasonable between the parties." Id. at 25, 325 N.E.2d at 546-47. The court announced:
 
 
 46
 A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public.
 
 
 47
 Id. at 26, 325 N.E.2d at 547.
 
 
 48
 The parties do not seriously contest that the contractual provision in issue here is unreasonable. Its scope is unlimited in terms of time, geographical area, and activities. Rather, the focus of Capitol American's argument is that the court should have rewritten this provision "to the extent necessary to protect the employer's legitimate interests," id., rather than striking it as void.
 
 
 49
 The court refused to modify the provision because it found that "there is no evidence in the record on which [it] could make the fact-specific determination necessary to decide how great an area, how wide a range of policies, and how long a time would constitute reasonable restrictions.... The Court is not in a position to make an informed decision, and declines Capitol American's request that it make a guess." Yeldell v. Tutt, No. 88-1031, slip op. at 16 (W.D. Ark. Aug. 7, 1989).
 
 
 50
 We believe that the court did not err in refusing to rewrite the contract. Neither Capitol American's request that it do so nor its suggested modifications were made within a reasonable time. Capitol American insists that it had no earlier opportunity to present evidence on this issue. While the court initially assumed that Arkansas law would govern, the court later informed the parties that there was some uncertainty on this issue. Thus, Capitol American was on notice at that time that Ohio law might control. Moreover, the contract in issue, drafted by Capitol American, expressly provided that Ohio law would govern. Capitol American should not have been surprised to learn that Ohio law did indeed control nor should it complain of lack of opportunity to suggest how the contract could be reasonably enforced. In Capitol American's motion for directed verdict, it discussed the effect of Ohio law but did not describe how the contract might be modified. In its motion for judgment notwithstanding the verdict or a new trial, Capitol American again discussed Ohio law but merely asserted that the court should rewrite the contract. It made no suggestions on how this should be done. Accordingly, we hold that the district court did not err in refusing to enforce or rewrite the contractual provision.
 
 V.
 
 51
 On cross-appeal, the Yeldells argue that the court erred in determining the amount of damages awarded by the jury on the defamation claim. According to the Yeldells, the jury verdicts in favor of Donald Yeldell included $75,000 in compensatory damages and $91,200 in punitive damages against David Tutt, and the same amounts of compensatory and punitive damages against Gloria Tutt. Similarly, they claim that Rita Yeldell was awarded $50,000 in compensatory damages and $60,800 in punitive damages against David Tutt, and the same amounts of compensatory and punitive damages against Gloria Tutt. The court, however, awarded Donald Yeldell $75,000 in compensatory damages and $91,200 in punitive damages against David Tutt, Gloria Tutt, and Southern Capitol jointly and severally. Rita Yeldell was awarded $50,000 in compensatory damages and $60,800 in punitive damages against David Tutt, Gloria Tutt, and Southern Capitol jointly and severally. The Yeldells now complain that the court, in essence, cut their jury verdicts in half.
 
 
 52
 We reject this argument. The Yeldells asserted that the Tutts and Southern Capitol were jointly and severally liable, inflicting a single injury. The court held that if the Tutts were both liable to each plaintiff, then the Tutts were jointly and severally liable as a matter of law. This was reflected throughout the trial, in the jury instructions, and in the verdict. It is fundamental that a plaintiff who secures a judgment against tortfeasors who are found jointly and severally liable may obtain only one recovery. Missouri Pac. R.R. Co. v. Armstrong, 200 Ark. 719, 725, 141 S.W.2d 25, 27 (1940); W. Keeton, Prosser and Keeton on the Law of Torts Sec. 47, at 325 (5th ed. 1984). When liability is joint and several, damages are assessed in a single sum and are not apportioned among tortfeasors. Southwestern Gas & Elec. Co. v. Godfrey, 178 Ark. 103, 108, 10 S.W.2d 894, 896 (1928). Accordingly, the court properly refused to apportion the verdict among the defendants here.
 
 VI.
 
 53
 After carefully considering all of the arguments raised, we affirm the judgment of the district court in all respects.
 
 
 
 [1]
 The Honorable G. Thomas Eisele, United States District Judge for the Western District of Arkansas
 
 
 [2]
 The instruction provided that:
 In order to recover punitive damages for defamation, plaintiffs have the burden of proving both of these elements:
 One, that the defendants made the statements with knowledge that they were false or in reckless disregard as to their truth or falsity; and
 Two, that the defendants acted with ill will or a desire to cause injury to the plaintiffs.
 You are not required to assess punitive damages against the defendants, but you may do so if it is justified by the evidence.
 Tutts' and Southern Capitol's App., Vol. V, at 1239.
 
 
 [3]
 See footnote 2