# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1087

_____

| | | |
|---|---|---|
| National American Insurance | * | |
| Company, a Nebraska Corporation, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the Eastern |
| v. | * | District of Arkansas. |
| | * | |
| Brenda H. Hogan, Individually, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 15, 1999
Filed: April 8,1999

_____

Before BOWMAN, Chief Judge, MURPHY, Circuit Judge, and VIETOR,[1] Senior
District Judge.

_____

VIETOR, Senior District Judge.

National American Insurance Company ("National") brought suit against
Brenda H. Hogan ("Brenda Hogan") for breach of contract and fraudulent
conveyance, contending that she breached a General Agreement of Indemnity
("GAI") and conspired with her husband, Ben Miles Hogan, Jr. ("Ben Hogan"), to

_____

[1]The Honorable Harold D. Vietor, Senior United States District Judge for the
Southern District of Iowa, sitting by designation.

defraud National through the improper transfer of assets. The case went to trial before a jury on November 24-25, 1997.[2] The trial court[3] directed the jury to answer four interrogatories that formulated the factual issues before the court—the first three related to the breach of contract claim, and the fourth, treated by the court as advisory in nature, related to the fraudulent conveyance claim. Based upon the jury's answers to the first three interrogatories, the trial court entered judgment in favor of Brenda Hogan on the breach of contract claim. The trial court also agreed with the jury's advisory answer to the fourth interrogatory and entered judgment in favor of Brenda Hogan on the fraudulent conveyance claim. On Brenda Hogan's motion, the trial court awarded her $41,084.71 in attorney's fees. National appeals the trial court's entry of judgment in Brenda Hogan's favor on both claims, and the award of attorney's fees, and we now affirm.

## I.
## A.

The facts established at trial concerning the breach of contract claim, viewed in a light most favorable to the jury's findings of facts, are as follows. At all times relevant to this action, Ben Hogan owned and was president of Hogan Construction Co., Inc. ("Hogan Construction"), an Arkansas highway construction company. During 1993 and 1994, Hogan Construction contracted with the Arkansas State Highway Commission ("ASHC") to perform work on different projects in Arkansas. Pursuant to these contracts, Hogan Construction was required to obtain a surety bond for each project. A surety bond is a tri-party agreement among a principal (the contractor), the surety (the bond or insurance company), and the obligee (the owner).

---

[2]National also sued Hogan Construction Company, Inc. and Ben Hogan, individually, for breach of contract and fraudulent conveyance; however, National accepted an offer of judgment from them prior to trial.

[3]The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

In the surety bond agreement, the surety ensures that either the principal will satisfy the terms of the construction contract or the surety will pay the obligee for the expenses caused by the principal's failure to do so. Hogan Construction used Babb Bonding, a general agent, to obtain surety bonds for these ASHC projects. Babb Bonding, in turn, went through Midwest Indemnity Corporation, a managing general agent, to acquire the necessary bonds from National. National issued bonds covering the ASHC projects.

In order to induce National to provide the surety bonds, as is the custom in the construction industry, Hogan Construction executed several General Agreements of Indemnity ("GAIs"). A GAI is a personal guarantee to the bonding company that the contractor will do the job according to plans and specifications, pay all subcontractor and supplier bills, and reimburse the bonding company for any funds the bonding company has to pay pursuant to the terms of the bonds. The validity and effect of three particular GAIs are relevant to National's breach of contract cause of action against Brenda Hogan. Each of these GAIs was a generic form document with appropriate blanks for the names of the contracting parties—the construction company, the bonding company or indemnitee, and the individual indemnitors. The first GAI named Midwest Indemnity Corporation as the indemnitee and was executed on May 16, 1988 by Ben Hogan, individually and as president of Hogan Construction, and Brenda Hogan. The second GAI, signed on October 15, 1991 by Ben Hogan, individually and as president of Hogan Construction, and Brenda Hogan, did not name an intended indemnitee or bonding company.[4] The third GAI was executed on February 18, 1994, for the benefit of National as the indemnitee, by Ben

_____

[4] This "blank" GAI was kept in the Hogan Construction file at the office of Babb Bonding until January 29, 1997, when, in response to a request for documents from National's counsel, a Babb Bonding employee typed "National American Insurance Company" into the blank designating the intended indemnitee and sent the agreement to National.

Hogan, individually and as president of Hogan Construction. Brenda Hogan did not execute the February 18, 1994 GAI.

Also entered into evidence were three letter agreements which attempted to limit Brenda Hogan's liability under the GAIs she executed. Two of the letter agreements were dated May 16, 1988, addressed to Midwest Indemnity Corporation, and executed by Brenda Hogan and Ben Hogan, individually and as president of Hogan Construction. These letter agreements purported to limit Brenda Hogan's liability under the May 16, 1988 GAI to the value of any interest she had at the time of execution, or may have in the future, in assets owned by Ben Hogan or Hogan Construction. The third letter agreement, which also sought to limit Brenda Hogan's potential liability under a GAI, was executed by Brenda Hogan and Ben Hogan, individually and as president of Hogan Construction, on October 15, 1991. This letter agreement was not addressed to anyone, did not reference the particular GAI it was limiting, and referred only to American Bonding Company,[5] not National or Midwest Indemnity Corporation. There was evidence that this letter agreement was stapled together with both the ABC form GAI dated October 15, 1991 and the generic October 15, 1991 GAI that did not designate a particular indemnitee.

After acquiring the necessary surety bonds from National, Hogan Construction commenced work on the ASHC projects. Hogan Construction soon failed, on one or more of the projects, to perform all of its obligations under the contract terms and to

---

[5]American Bonding Company is a Nebraska bonding company which provided bonds for Hogan Construction from May 1991 through March 1993. The evidence at trial established that American Bonding Company developed a form indemnity agreement ("ABC form") that was different from the generic form used by National and Midwest Indemnity Corporation. The ABC form was not a generic form with a blank for the name of the indemnitee, but rather ran specifically to the benefit of the American Bonding Company. Ben and Brenda Hogan executed an ABC form indemnity agreement on October 15, 1991, in addition to the generic "blank" GAI they signed on that date.

pay various subcontractors and material suppliers. National responded, pursuant to its obligations set forth in the surety bonds, by arranging for the satisfactory completion of the projects and paying the subcontractors and suppliers Hogan Construction failed to pay. National then initiated this suit seeking reimbursement for its expenditures pursuant to the GAIs executed by Ben Hogan, individually and on behalf of Hogan Construction, and Brenda Hogan.

**B.**

The facts established at trial concerning the fraudulent conveyance cause of action, presented in a light most favorable to the district court's findings of facts, are as follows. Ben and Brenda Hogan married on January 24, 1976, and remained married at all times relevant to this case. Prior to her marriage to Ben Hogan, Brenda Hogan inherited a substantial amount of money from her father. When Ben Hogan's construction company, then named Ben M. Hogan Company, Inc., ran into financial difficulty in January 1987, Brenda Hogan used some of her inheritance to loan the company $100,000. On August 20, 1987, the construction company repaid Brenda Hogan $11,000 on that loan, $5191.78 in principal and $5808.22 in interest. Brenda Hogan subsequently loaned the company an additional $55,000. In repayment of those loans, in May 1990, the company deeded a parcel of land on Ross Hollow Road to Brenda Hogan. That parcel of land, known as the Boyle Place, contained a house and some outbuildings. Ben and Brenda Hogan had lived at that homestead since 1988. Ben and Brenda Hogan spent a significant amount of money remodeling their home on the Boyle Place property both before and after the company deeded ownership of the property to Brenda Hogan. In June 1990, to finance some of this remodeling, the couple took out a "Future Advance Construction" loan for $143,203, collateralled by a mortgage on the Boyle Place property.

In addition to the Boyle Place owned by Brenda Hogan, Ben Hogan and Hogan Construction each owned a tract of land on Ross Hollow Road. After the tracts of land owned by Ben Hogan and Hogan Construction, known as the "Hall Farm" and

the "Gunn Farm," respectively, became encumbered by tax liens and other debts, Ben Hogan and Hogan Construction sought to sell the two farms. These two tracts of land would not sell at a price sufficient to cover the encumbrances, however, unless Brenda Hogan agreed to sell her tract along with the other two. Thus, on or about June 1, 1994, Ben and Brenda Hogan, and Hogan Construction, sold all three tracts of land for a combined price of $1.1 million to William T. Walker and Judy Walker.

After the proceeds of the sale were applied to the indebtedness of Ben Hogan, Hogan Construction, and Brenda Hogan, Brenda deposited the remaining proceeds, $235,836.22, into her personal account. In total, in exchange for the Boyle Place property, Brenda Hogan received $235,836.22 in cash, plus the absolution of the $117,943.67 debt remaining on the Future Advance Construction loan. There was testimony at trial that Brenda Hogan's basis in the Boyle Place had been approximately $319,000—$150,000 loaned to Ben Hogan's construction company plus $169,000 for remodeling expenses.

On or about June 14, 1994, Brenda Hogan purchased a house at 19 Sherrill Road in Little Rock, Arkansas. Brenda Hogan both utilized the proceeds from the sale of the Boyle Place property and executed a mortgage to purchase the home.

Between February 2, 1993, and November 20, 1996, Ben Hogan made payments directly to Brenda, or on her behalf, totaling $114,921.64. The payments made on Brenda Hogan's behalf were generally mortgage payments for property owned solely by Brenda Hogan but occupied by both Ben and Brenda Hogan, as husband and wife. The rest of the direct payments were explained by Ben and Brenda Hogan as gifts, money for living expenses, money for remodeling their home, and repayment of loans.

**C.**

On April 19, 1996, National filed a complaint against Hogan Construction and Ben Hogan, individually, for breach of the February 18, 1994 GAI, and against Hogan Construction and Ben and Brenda Hogan for the fraudulent conveyance of property. Discovery revealed the existence of the General Agreements of Indemnity which had been executed by Brenda Hogan in 1988 and 1991. National then filed an Amended Complaint adding Brenda Hogan as a defendant to the breach of contract claim.

Ben Hogan and Hogan Construction made an offer of judgment for $296,049.16 which was accepted by National. National's action against Brenda Hogan proceeded to a jury trial, conducted on November 24 and 25, 1997. The trial judge directed the jury to answer the following four interrogatories:[6]

### INTERROGATORY NO. 1
Do you find from a preponderance of the evidence that Brenda H. Hogan entered into a valid indemnity contract under which she agreed to reimburse National American Insurance Company for losses sustained on performance bonds executed by her husband, Ben Miles Hogan, Jr., and Hogan Construction Company, Inc.?

### INTERROGATORY NO. 2
Do you find from a preponderance of the evidence that any indemnity contract entered into between the parties was accompanied by a document limiting Brenda H. Hogan's liability which was accepted by National American Insurance Company?

### INTERROGATORY NO. 3
Do you find from a preponderance of the evidence that any liability Brenda H. Hogan had by virtue of executing the indemnity

_____

[6]The jury was instructed that if it answered "NO" to Interrogatory No. 1, it did not need to answer any other interrogatory.

agreement of May 16, 1988, or October 15, 1991, was extinguished by the acceptance of the indemnity agreement dated February 18, 1994?

INTERROGATORY NO. 4

Do you find from a preponderance of the evidence that Brenda H. Hogan and her husband entered into a conspiracy to defraud National American Insurance Company of their ability to satisfy judgment against them by transferring Mr. Hogan's assets and the assets of Hogan Construction Company, Inc., to Mrs. Hogan?

On November 25, 1997, the jury returned its answers to the interrogatories. The jury answered Interrogatories Nos. 1, 2, and 3 in the affirmative, and Interrogatory No. 4 in the negative. The trial court entered judgment on November 26, 1997. The court entered judgment in favor of Brenda Hogan on the breach of contract claim based on the jury's answers to Interrogatories Nos. 1, 2, and 3. The court recognized that the fraudulent conveyance issue was within its equity jurisdiction, so the court treated the jury's answer to Interrogatory No. 4 as advisory in nature. The court concluded that the jury's answer comported with the court's analysis of the facts and the law, and entered judgment in favor of Brenda Hogan on the fraudulent conveyance claim.

Brenda Hogan then filed a motion for an award of attorney's fees under Ark. Code Ann. § 15-22-308. Section 15-22-308 provides: "In any civil action to recover on . . . [a] breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs." The trial court concluded that the essence of the case, and the majority of the proof at trial, related to National's contract claim, that Brenda Hogan had prevailed on the contract claim, and that National failed to advance any justification for denying her the fees. The court granted Brenda Hogan's motion and awarded her $41,084.71 in fees. This appeal followed.

**II.**

National argues that the jury erred in finding, in answer to Interrogatory No. 2, that any indemnity contract entered into between Brenda Hogan and National was accompanied by a valid limiting agreement. This argument is essentially an insufficiency of the evidence argument. In a diversity case, we generally apply the same standard, when reviewing a jury verdict, that is used by the state in which the district court sits. See City Nat'l Bank v. Unique Structures, Inc., 929 F.2d 1308, 1314 (8th Cir. 1991). Applying Arkansas law, "we must view the evidence in the light most favorable to the verdict and determine 'whether there is substantial evidence to support the jury verdict.'" Yeldell v. Tutt, 913 F.2d 533, 540 (8th Cir. 1990) (quoting Weber v. Bailey, 787 S.W.2d 690, 691 (Ark. 1990)). In so doing, "[w]e must give 'the verdict the benefit of all reasonable inferences permissible under the proof.'" Id. (quoting Schaeffer v. McGhee, 689 S.W.2d 537, 538 (Ark. 1985)). Substantial evidence is "evidence that was sufficient to compel a conclusion one way or the other that goes beyond suspicion or conjecture." Aronson v. Harriman, 901 S.W.2d 832, 838 (Ark. 1995); see also Carpenter v. Automobile Club Interinsurance Exch., 58 F.3d 1296, 1301(8th Cir. 1995).

In challenging the jury's finding, represented by the jury's affirmative answer to Interrogatory No. 2, that any GAI executed by Brenda Hogan and National was limited by a valid limiting agreement, National relies on the following interpretation of the facts developed at trial. First, National assumes that in answering Interrogatory No. 1 in the affirmative—did Brenda Hogan enter a valid indemnity agreement with National?—the jury was relying solely on the generic 1991 GAI that was initially left blank as to the indemnitee or bonding company. Second, National contends that the limiting agreement signed by Brenda Hogan on October 15, 1991 was intended to limit only the ABC form GAI signed by Brenda Hogan on that date. Thus, National argues, the generic 1991 GAI that the jury found was a binding agreement between Brenda Hogan and National was not accompanied by a limiting agreement.

Although National's interpretation of the evidence may be reasonable, there is an alternative interpretation, supported by substantial evidence, which is consistent with the jury's answers to Interrogatories Nos. 1 and 2. First, there is substantial evidence in the record that the generic 1991 GAI was not intended for the benefit of National at all, and thus not a valid agreement between it and Brenda Hogan. Second, there was substantial evidence that the May 16, 1988 GAI was a valid agreement between Brenda Hogan and National. Third, National did not dispute that the May 16, 1988 GAI was accompanied by a corresponding limiting agreement. Thus, the jury could have reasonably concluded that the 1988 GAI was the only valid agreement between Brenda Hogan and National and that the 1988 GAI was limited by a valid limiting agreement. Because we must give the jury verdict the benefit of all reasonable inferences, we assume that the jury adopted this interpretation.

National contends, in the alternative, that the limiting agreements are unenforceable because they were not properly endorsed or otherwise executed by a representative of National. This argument fails, however, because there was substantial evidence introduced at trial that the limiting agreements were executed by all parties in the same manner and at the same time as the corresponding GAI; the indemnitors executed the limiting agreements by signing them and National accepted the limiting agreements by issuing the bonds. Cf. Fidelity & Cas. Co. v. Charles W. Angle, Inc., 91 S.E.2d 575, 579 (N.C. 1956) (recognizing that surety can show assent to indemnity agreement by issuing performance bonds). Thus, if the GAIs were validly executed, as National acknowledges, then so too were the limiting agreements. For the foregoing reasons, we find no reversible error in the jury's answer to Interrogatory No. 2.

National contends that even if Brenda Hogan's liability under any GAI was limited, the trial court erred in entering judgment in favor of Brenda Hogan because National should have been awarded at least a limited recovery under the terms of the controlling agreements. The trial court entered judgment in favor of Brenda Hogan

on the contract claim, however, because the jury found that any liability assumed by Brenda Hogan under the 1988 and 1991 GAIs was extinguished by National's acceptance of the February 18, 1994 GAI.  Because we do not disturb that finding, National's argument as to why Brenda Hogan remains liable even under a limited agreement is without merit.

## III.

National also challenges the jury's finding, represented by its affirmative answer to Interrogatory No. 3, that National's acceptance of the February 18, 1994 GAI signed only by Ben Hogan and Hogan Construction extinguished Brenda Hogan's liability under the May 16, 1988 and October 15, 1991 GAIs.  Although the parties failed to frame this issue in terms of a substituted contract defense, we interpret the jury's affirmative answer to Interrogatory No. 3 as a finding that National accepted the 1994 GAI as a substitute for the 1988 and 1991 GAIs.  National contends that it did not intend to accept the 1994 GAI as a substitute for the earlier agreements and that the trial court should have found such an intent lacking as a matter of law based upon the unambiguous language of the form agreements.  In the alternative, National contends that there was insufficient extrinsic evidence of such an intent to support the jury's finding.

Arkansas recognizes the substituted contract defense to a contract cause of action.[7]  See Haskins Law Firm v. American Nat'l Property and Cas. Co., 804 S.W.2d 714, 716 (Ark. 1991). Pursuant to that defense, when the parties to a contract execute a "valid and legally substituted agreement the original agreement merges into it and is extinguished."  Id. at 716 (finding parties intended second contract promising liquidated sum to be a substitute contract releasing rights to percentage of recovery provided for under original contract).  Thereafter, any "failure to perform the

_____

[7]Neither party disputes that Arkansas law governs this case.

-11-

substituted agreement will not revive the old agreement." Id. As section 279 of the Restatement (Second) of Contracts explains:

> (1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.
> (2) The substituted contact discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

Restatement (Second) of Contracts § 279 (1990); see also Haskins Law Firm, 804 S.W.2d at 716 (quoting § 279 of the Restatement).

The substituted contract defense may be raised by a co-obligor to an original contract if the obligee accepts a subsequent agreement signed only by the other obligor as a substitute for the original contract. Such was the case in Brandon v. Worthen Bank & Trust Co., 639 S.W.2d 66 (Ark. Ct. App. 1982). In Brandon, two parties jointly signed a note to the Worthen Bank and Trust on December 5, 1980. See Brandon, 639 S.W.2d at 66. On March 18, 1980, one of the parties executed a separate note with the bank. See id. The court found sufficient evidence to conclude that the second note was accepted by the bank as a substitute for the first, thereby releasing the party to the first note who did not sign the second. See id. at 68. In so doing, the court relied on a prior decision, Young v. Farmers Bank & Trust Co., 453 S.W.2d 47 (Ark. 1970), which likewise found that a co-obligor was released from liability when the obligee accepted a subsequent note signed only by the other obligor as a substitute for the first note. See Brandon, 639 S.W.2d at 67. Both the Brandon and Young courts quoted with approval section 1293 of Corbin on Contracts, which states: "When two persons are jointly indebted to a third, the creditor may accept the note of one of them either as a mere collateral security or as a substituted contract and satisfaction. If the latter is found to be the fact, the co-obligor is at once discharged by novation." 6 Arthur Linton Corbin, Corbin on Contracts § 1293 (1962), quoted in Brandon, 639 S.W.2d at 67; Young, 453 S.W.2d at 49; cf. McLean County Bank

v. Brokaw, 519 N.E.2d 453, 457-58 (Ill. 1988) (finding a co-obligor released from liability because she was not a party to a subsequent, substitute contract signed by the other co-obligor); 6 Arthur Linton Corbin, Corbin on Contracts § 1298 (1962).

To establish the validity of the substituted contract defense in this case, Brenda Hogan must prove by a preponderance of the evidence four essential elements: (1) the existence of a previous valid contract; (2) the parties agreed to a new contract; (3) the parties formed a valid new contract; and (4) the parties intended to extinguish the old contract and substitute the new.[8] See 15 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 1869 (3d ed. 1972); cf. Trostel v. American Life & Cas. Ins. Co., 92 F.3d 736, 740 (8th Cir. 1996), vacated on other grounds by American Life & Cas. Ins. Co. v. Trostel, 519 U.S. 1104 (1997) (recognizing these elements of novation under Iowa law); F.D.I.C. v. Ellis, 968 F. Supp. 1441, 1444-45 (D. Kan. 1997) (recognizing these elements as elements of substituted contract defense under Kansas law). The jury found that there was a previous valid agreement between Brenda Hogan and National. Moreover, none of the parties suggests that the February 18, 1994 agreement was in any way invalid. Accordingly, the fighting issue before us, as it was before the trial court, is whether the parties intended to extinguish the 1988 and 1991 GAIs by substituting the 1994 GAI in their stead.

---

[8]Courts often refer to substituted contracts as novations. The elements of the two doctrines are identical except for the presence of a new party in a novation. See F.D.I.C. v. Ellis, 968 F. Supp. 1441, 1445 n.2 (D. Kan. 1997); Restatement (Second) of Contracts § 279, cmt. a (1979) ("If a substituted contract brings in a new party it is called a 'novation.'"). Because the 1994 GAI did not bring in a new party, it is most accurately described as a substituted contract, and not a novation. Nonetheless, because the terms are virtually interchangeable, case law discussing novations informs our decision.

Over the objection of counsel for National, the trial court gave this issue to the jury by presenting the jury with the following instruction and corresponding interrogatory:

INSTRUCTION NO. __11__

Brenda H. Hogan asserts as a defense to the plaintiff's claim that any liability Brenda H. Hogan had by virtue of executing the indemnity agreements of May 16, 1988 or October 15, 1991 was extinguished by the acceptance of a new indemnity agreement dated February 18, 1994, to which she was not a party.

In order to prevail on this defense, Brenda H. Hogan has the burden of proving by a preponderance of the evidence that the February 18, 1994 agreement was accepted by National American Insurance Company in satisfaction or substitution of any obligation of Brenda H. Hogan arising from the May 16, 1988 and October 15, 1991 documents.

If you find for Brenda H. Hogan on this issue, your verdict should be for Brenda H. Hogan.

INTERROGATORY NO. 3

Do you find from a preponderance of the evidence that any liability Brenda H. Hogan had by virtue of executing the indemnity agreement of May 16, 1988, or October 15, 1991, was extinguished by the acceptance of the indemnity agreement dated February 18, 1994?

National objected to both Instruction No. 11 and Interrogatory No. 3 at trial because National believed paragraph 19 of the generic GAIs unambiguously expressed the parties' intent not to substitute the 1994 GAI for the earlier agreements. Paragraph 19 of the 1988, 1991, and 1994 generic GAIs provides:

> That the Indemnitor and the Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitor and the Indemnitors, accepted or released other agreements of Indemnity or collateral in connection with the execution or procurement of said Bonds, from the Indemnitor or Indemnitors or others, it being expressly understood and agreed by the

Indemnitor and the Indemnitors that any and all other rights which the Surety may have or acquire against the Indemnitor and the Indemnitors and/or other under any such other or additional agreements of Indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

The trial court overruled National's objections without commenting on the validity or effect of this agreement language. Rather, the court decided to give the instruction and interrogatory because: "Mr. Hogan testified that the subsequent performance bonds that were written were based on this document. And it was a hiatus between the time National American was writing and the time they resumed writing again." Tr. at 208. National contends that the trial court erred in overruling its objections to Instruction No. 11 and Interrogatory No. 3 and deciding to give the issue of intent to substitute to the jury. In the alternative, National argues that the jury erred in finding that such an intent existed.

As an initial matter, we find National's reliance on the language contained in paragraph 19 of the 1988 and 1991 GAIs to be misplaced. Even though paragraph 19 appears to establish that any subsequent indemnity agreement executed by the parties is merely in addition to, and not in lieu of, the original GAI, the parties could, by mutual consent, decide to override this language in a subsequent agreement. It has long been the law that

> Any persons competent to make a contract can as validly agree to rescind it as they could agree to make it in the beginning. It is entirely competent for parties who have entered into a contract to modify it, to waive their rights under it, to vary or modify its terms, or to substitute a wholly different contract from the original one. And this may be done by mutual consent . . ..

First Nat'l Bank v. Tate, 13 S.W.2d 587, 589 (Ark. 1929); see also Southern Acid & Sulfur Co. v. Childs, 184 S.W.2d 586, 588 (Ark. 1945) (quoting 17 C.J.S., Contracts,

-15-

§ 374 which states that "a provision in the contract as to the method of change is not exclusive of other methods of modification"); Corbin on Contracts § 1295 ("Any written contract . . . can be rescinded or varied at will by . . . agreement of the parties . . .. Two contractors cannot by mutual agreement limit their power to control their legal relations by future mutual agreement."). Thus, we must look to the intent of the parties in executing the 1994 GAI to determine whether the parties agreed, by mutual consent, to substitute the 1994 GAI for the earlier agreements.

In order to prove the substituted contract defense, Brenda Hogan needed to establish evidence of a "clear and definite intention" on the part of National to release the obligors and their obligations under the 1988 and 1991 agreements, and substitute the obligors and their obligations under the 1994 agreement. See McIllwain v. Bank of Harrisburg, 713 S.W.2d 469, 473 (Ark. Ct. App. 1986) (finding no evidence of such an intent); Sterling v. Sterling, 621 S.W.2d 1, 2-4 (Ark. Ct. App. 1981) (finding no showing of a clear and definite intention of one of the parties to accept the modified support payments as a substituted agreement); Alston v. Bitely, 477 S.W.2d 446, 454 (Ark. 1972) (deferring to trial court's decision that extension agreement did not constitute a novation). Such an intent may be established by the express words of the parties or by the facts and circumstances attending the transaction and in the conduct of the parties thereafter. See Elkins v. Henry Vogt Mach. Co., 187 S.W. 663, 664 (Ark. 1916) (citations omitted) ("'It is not essential that the assent to and acceptance of the terms of the novation be shown by express words to that effect, but the same may be implied from the facts and circumstances attending the transaction and in the conduct of the parties thereafter."); see also Alston, 477 S.W.2d at 454 (noting that intent to substitute may be found in the circumstances of the case, including the subsequent conduct of the parties, if not expressly declared). In this case, the parties did not expressly declare their intent to substitute the 1994 agreement

-16-

for the earlier GAIs.[9]  Thus, the issue was one of fact and properly given to the jury. See Alston, 477 S.W.2d at 454. ("The [intent] issue is one of fact if there is any conflicting evidence or if the terms of the agreement are capable of more than one construction."); International Minerals & Chem. Corp. v. Caplinger, 411 S.W.2d 526, 528 (Ark. 1967) (finding a fact issue for the jury as to intent to release initial obligor from liability on debt through subsequent agreement); Williston on Contracts, at § 1869 ("Whether a new debtor is intended to operate as a release of the liability of the old in the absence of an express agreement to that effect, is usually a question of fact and can only become a question of law when the state of the evidence is such that reasonable minds cannot differ as to its effect.").  After hearing all the evidence concerning the circumstances surrounding the execution of the 1994 agreement, and the parties' conduct thereafter, the jury found that National intended to substitute the 1994 GAI for the earlier agreements executed by, among others,  Brenda Hogan.

---

[9]Although paragraph 19 of the 1994 GAI expressly provides that the 1994 GAI shall not be extinguished by subsequent indemnity agreements accepted by National, the contract does not unambiguously express what impact the 1994 agreement is intended to have on prior indemnity agreements.  This is especially true in light of the circumstances surrounding the making of the contract; specifically, the twenty-two month hiatus since National last issued a bond on Hogan Construction's behalf.  Not only may a trial court become acquainted with such circumstances, see First Nat'l Bank v. Griffin, 832 S.W.2d 816, 819 (Ark. 1992)(recognizing that the parol evidence rule does not prohibit the court's acquainting itself with the circumstances surrounding the making of the contract), but a trial court is obliged to determine whether such extrinsic or parol evidence reveals a latent ambiguity in the language of the agreement.  See Countryside Cas. Co. v. Grant, 601 S.W.2d 875, 877-78 (Ark. 1980) (recognizing that trial court may consider parol evidence to reveal latent ambiguity).  In light of the twenty-two month hiatus and the other circumstances discussed below, we do not find the trial court's determination that the agreement was ambiguous on the intent to substitute issue to be clearly erroneous.  See id. (applying clearly erroneous test to trial court's finding of latent ambiguity).

As we previously recognized, under Arkansas law, we cannot reverse the jury's finding of fact on this issue unless it is unsupported by substantial evidence. After giving "'the verdict the benefit of all reasonable inferences permissible under the proof,'" Yeldell, 913 F.2d at 540, we are convinced that the jury's finding is supported by substantial evidence that goes beyond mere conjecture or speculation. See Aronson, 901 S.W.2d at 838. The circumstances surrounding the execution of the 1994 GAI suggest that all the parties believed they were initiating their indemnity relationship anew in February of 1994. From May 1, 1991 through March 8, 1993, Hogan Construction relied solely on American Bonding Company, not National, as its source for construction bonds. Hogan Construction began using National again as a source for construction bonds in the Spring of 1993. The 1994 GAI was executed before National agreed to provide three of the four bonds which are at the heart of this litigation. Ben Hogan testified that it was his understanding that the National bonds giving rise to the claim of liability in this case were issued on the strength of the 1994 GAI. National did not refute this contention. Throughout this re-initiation of National and Hogan Construction's relationship, Brenda Hogan was ignored; suggesting that she was no longer involved in the relationship. See Alston, 477 S.W.2d at 454 (citation omitted) ("In determining whether there has been a novation by substitution of debtors and a discharge of the lien of a mortgage given by the original debtor, significance has been accorded to the fact that the original debtor was ignored in the transaction.").

Even more suggestive of an intent to extinguish Brenda Hogan's liability under the prior agreements is National's conduct after the 1994 agreement was executed. When claims began to surface against bonds issued after 1993, National looked for indemnity solely from Hogan Construction and Ben Hogan. Indeed, in its original complaint, National expressly relied on only the February 18, 1994 GAI. National never contacted Brenda Hogan about being a source of indemnity until after National received, through discovery, the inadvertently modified October 15, 1991 GAI in January 1997. See Brandon, 639 S.W.2d at 68 (finding sufficient evidence of an

intent to substitute a second note for the first, thereby releasing a party to the first, because, among other things, when the bank filed suit it attempted only to collect and seek judgment on the second note).  In sum, we find that all of the circumstances, both before and after the execution of the 1994 GAI, establish substantial evidence from which the jury could find an intent to substitute the 1994 agreement for the earlier GAIs executed by Brenda Hogan.  Accordingly, we do not disturb the jury's finding that Brenda Hogan's potential liability under the 1988 and 1991 GAIs was extinguished by National's acceptance of the 1994 agreement.

## IV.

National also challenges the district court's decision to enter judgment in favor of Brenda Hogan on the fraudulent conveyance claim.  The district court adopted the jury's finding, represented by the jury's negative answer to Interrogatory No. 4, that Brenda Hogan did not conspire with her husband to defraud National through the improper transfer of assets, because the finding comported with the court's analysis of the facts and the law.  We will not disturb the district court's conclusion unless it is clearly erroneous.  See Fed. R. Civ. P. 52(a); F.P.P Enterprises v. United States, 830 F.2d 114, 117 (8th Cir. 1987) (reviewing district court's conclusion that transfers were fraudulent conveyances and shams under clearly erroneous standard).  "'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Anderson v. Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).  We may not reverse the district court's finding of fact merely because we would have decided the case differently.  See id.  Rather, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Id. at 574 (citing United States v. Yellow Cab Co., 338 U.S. 338, 342 (1949)).

National contends that the evidence supports a finding that Ben Hogan directly and indirectly transferred his assets, and those of Hogan Construction, to Brenda Hogan for the purpose of defrauding creditors, i.e., National. Brenda Hogan contends that the evidence merely reveals the everyday financial dealings of a husband and wife. Because both views of the evidence are permissible, the district court's decision to adopt the latter view was not clearly erroneous.

## V.

The trial court awarded Brenda Hogan attorney's fees under section 16-22-308 of the Arkansas Code, which provides that a prevailing party in a contract action may be awarded attorney's fees. See Ark. Code Ann. § 16-22-308. The trial court concluded that the essence of the case, and the majority of the proof at trial, related to National's contract claim; that Brenda Hogan had prevailed on the contract claim; and that National failed to advance any justification for denying her the fees. An award of attorney's fees under this statute will be reversed only if the trial court abused its discretion. See TCBY Systems, Inc. v. RSP Co., Inc., 33 F.3d 925, 930 (8th Cir. 1994); Security Pac. Hous. Serv., Inc. v. Friddle, 866 S.W.2d 375, 379 (Ark. 1993). No such abuse of discretion is apparent on the record.

## CONCLUSION

For the above-stated reasons, we affirm the judgment of the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-20-