**William Lee ROBERTS, Plaintiff,**

v.

**OWENS–CORNING FIBERGLASS CORP., et al, Defendants.**

**Cause No. IP94–1248–C M/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 16, 1999.

Linda George, Laudig George Rutherford & Sipes, Indianapolis, IN, Allard Allston, Ness Motley Loadholt Richardson & Poole, Barnwell, SC, for William Lee Roberts.

Patrick J. Phillips, Jenner & Block, Chicago, IL, Jon L. Williams, Indianapolis, IN, Bruce L. Kamplain, Norris Choplin & Schroeder, Indianapolis, IN, for Bell Asbestos Corporation Ltd.

Robin L. Babbitt, Bingham Summers Welsh & Spilman, Indianapolis, IN, for Pittsburgh Corning Corp.

### *ORDER*

McKINNEY, District Judge.

This matter comes before the Court on a motion filed July 13, 1998, by defendant Bell Asbestos Mines Ltd. ("Bell"), seeking dismissal for lack of personal and subject matter jurisdiction. That motion was filed nearly four years after removal of the action to this Court, and a mere three weeks before the trial by jury was set to commence. Because of the impending trial date, the Court deferred ruling on the dispositive motion until after the conclusion of the trial. Beginning on August 3, 1998, a jury heard all of the evidence against defendant Bell in this product liability action and rendered its verdict on August 6, 1998, in favor of the plaintiff,

William Lee Roberts ("Roberts"). The jury found that Bell's asbestos had caused personal injury to Roberts and awarded him damages in the amount of $150,000.00. Judgment has not been entered on that verdict.

Also pending are Roberts' motions relating to entry of judgment on the jury verdict, and his petition for an award of compensable costs pursuant to Rule 54(d) and 28 U.S.C. § 1920, and Bell's motions for set-off against the judgment, for more specific information regarding the settlements, and to strike Roberts' claim for costs. Before addressing the issues relating to these motions, the Court must first decide whether it was proper to exercise jurisdiction over defendant Bell, and whether it had subject matter jurisdiction over an action against this defendant.

## I. PERSONAL JURISDICTION

Bell claims that the Court may not exercise personal jurisdiction over it because it is a Canadian corporation that does not, and did not, do business within the State of Indiana, meaning it had insufficient contacts with the state to make the exercise of personal jurisdiction over it constitutional. In a diversity case, such as this, a district court has jurisdiction over a nonresident defendant only if a court of the state in which the district court sits would have jurisdiction. *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1243 (7th Cir.1990), *cert. denied*, 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991). Indiana courts have noted that the state's "long-arm statute," expressed in Rule 4.4 of the Indiana Rules of Court, extends personal jurisdiction to the limit allowed under the due process clause of the fourteenth amendment. *See Griese–Traylor Corp. v. Lemmons*, 424 N.E.2d 173, 180 (Ind.Ct.App.1981). The Indiana rule provides, in relevant part:

Any person or organization that is a nonresident of this state ... submits to the jurisdiction of the courts of this state as to any action arising from the follow-

ing acts committed by him or her or his or her agent:

(1) doing any business in this state;

\* \* \* \* \* \*

(3) causing personal injury or property damage in this state by an occurrence, act or omission done outside this state if he regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue or benefit from goods, materials, or services used, consumed, or rendered in this state;

Ind. Tr. R. 4.4.

There is no question that Roberts suffered personal injury by an occurrence, act or omission done outside the state and that Bell derived substantial revenue from goods or materials used in this state. Moreover, the jury's verdict settles the issue of whether Roberts' injuries were caused by Bell's acts or omissions. Thus, the primary consideration in this diversity action is whether an exercise of jurisdiction would comply with due process. *Id.* It would if the Court determines that Bell purposefully established "minimum contacts" with the state, such that maintaining the suit does not offend "traditional notions of fair play and substantial justice." *See Wilson*, 916 F.2d at 1243. The minimum contacts requirement can be met in a products liability action using the "stream of commerce" theory of purposeful contact with the forum state. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Roberts invokes that theory.

Under the "stream of commerce" theory, due process is satisfied when a corporation delivers "its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *See Dehmlow v. Austin Fireworks*, 963 F.2d 941, 946 (7th Cir. 1992) (quoting *World–Wide Volkswagen*, 444 U.S. at 297–98, 100 S.Ct. 559). Bell, on the other hand, argues that a subse-

quent Supreme Court decision modifying that theory is analogous to and dictates the outcome of this case. *See Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In *Asahi*, the Court stated that the connection between the defendant and the forum state must occur by *"an action of the defendant purposefully directed toward the forum state."* *Id.* (emphasis in original). The Court further noted that the "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.*

Like the defendant in *Asahi*, Bell argues that it did not purposefully direct its activities toward this state. It did not register to do business in Indiana, nor does it have any agents, employees, offices, bank accounts or property in the state. Ex. B, Dufour Aff. ¶¶ 4–7. According to Bell's counsel, Richard Dufour, Bell only mines and mills raw asbestos fiber, it does not manufacture it into a product. *Id.* ¶ 3. Consequently, Bell cannot be found to have directed its activities toward a forum state by tailoring its product specifically for any market in the United States. *Id.* Dufour also states that the sale of Bell asbestos fibers occurred only in Canada, as did any deliveries, and that Bell has not negotiated, entered, or performed any contracts in Indiana. *Id.* ¶ 8. To the extent that any Bell asbestos appeared in Indiana, Bell argues, it was the result of the autonomous action of a third party. Relying on *Asahi*, Bell contends it cannot be held liable for a third party's unilateral act of transferring raw asbestos from Canada to Indiana. 480 U.S. at 109, 107 S.Ct. 1026. That portion of the *Asahi* decision, however, referred to the situation in *World–Wide Volkswagen* where a consumer purchased a vehicle in one state and drove it to another in which the injury occurred. It was the assertion that minimum contacts could be established by a *consumer's* unilateral act of bringing a product to the forum state that the Court rejected. *Id.*

The situation is entirely different when a corporation transfers its product to a manufacturer or distributor with the expectation that either of them would deliver the product into the stream of commerce for use in the forum state. More distinguishable is the case in which the manufacturer or distributor is a subsidiary or other entity related to the defendant corporation. When the sale of a product is not isolated, but arises from the efforts of a corporation to serve, directly or indirectly, the market for its product in other states, it is not unreasonable to subject the corporation to suit in one of those states. *See Asahi*, 480 U.S. at 110, 107 S.Ct. 1026 (quoting *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559). Moreover, the absence of physical presence in the forum state has long been held not to defeat personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). "So long as a commercial actor's efforts are purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* Consequently, the fact that Bell was not registered to do business in Indiana, had no agents, employees, offices, property or bank accounts in this state, will not defeat personal jurisdiction if the Court finds that Bell purposefully directed its commercial efforts toward Indiana residents, and if it would not be unreasonable to require Bell to defend its actions here. *See Klump v. Duffus*, 71 F.3d 1368, 1371 (7th Cir.1995), *cert. denied*, 518 U.S. 1004, 116 S.Ct. 2523, 135 L.Ed.2d 1047 (1996), (citing *Burger King*, 471 U.S. at 472–78, 105 S.Ct. 2174).

Before reaching that analysis, however, the Court will address Roberts' arguments against dismissal. Roberts claims that Bell admitted to this Court's jurisdiction when it joined in a co-defendant's petition for removal from the Indiana state court in which the action was originally

filed. Specifically, Roberts points to an allegation in that petition that this Court "would have original jurisdiction over this action pursuant to 28 U.S.C. § 1332." Section 1332 governs subject matter jurisdiction, not personal jurisdiction. Despite Roberts' assertion to the contrary, Bell's joinder in the removal petition does not mean it has already consented to this Court's personal jurisdiction over it.

■■■ A stronger case for denial of Bell's motion to dismiss is made by Roberts' argument that Bell waited too long before challenging the Court's jurisdiction, and thus waived the defense. In response, Bell points out that it included a denial of jurisdiction in its answer and as an affirmative defense, and therefore, pursuant to Rule 12(h), it preserved that defense. Bell is correct. The question, however, is for how long will the defense by preserved. Asserting a jurisdictional defect in the answer does not preserve the defense "in perpetuity." *Yeldell v. Tutt,* 913 F.2d 533, 539 (8th Cir.1990); *accord Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 914 (7th Cir.1994), *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1964, 131 L.Ed.2d 855 (1995), (it defeats the "purpose of requiring prompt assertion of the defense of lack of personal jurisdiction if the defendant, having raised an objection ... at the outset as required, could without any penalty fail or refuse to press it, creating the impression that he had abandoned it ...."). In *Rice* the court noted a difference between Rule 12(h) and the "doctrine of waiver, which is applicable to all defenses except lack of subject-matter jurisdiction." *Rice,* 38 F.3d at 914. Under that doctrine, the defense of lack of personal jurisdiction can be lost "by failure to assert it seasonably, by formal submission in a cause, or by submission through conduct." *Yeldell,* 913 F.2d at 539 (citing *Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 168, 60 S.Ct. 153, 84 L.Ed. 167 (1939)). When a defendant's conduct does not "reflect a continuing objection to the power of the court to act over the defendant's person,"

the defense is waived. *Yeldell,* 913 F.2d at 539.

In this action, Bell's conduct has not reflected a continuing objection to the Court's power over it, and by acting as if it were submitting to the Court's jurisdiction, Bell has waived the defense of lack of personal jurisdiction. Bell demanded a jury trial, agreed to a Case Management Plan, filed preliminary and final witness and exhibit lists, sought time to respond to discovery requests, moved for summary judgment, and opposed Roberts' motion for partial summary judgment before filing its motion to dismiss for lack of personal jurisdiction. By the time Bell asserted the personal jurisdiction issue for resolution, the case was nearly over. While it is true that Bell withdrew its summary judgment motion on July 8, 1998, it did so after Roberts had filed a brief in response on April 30, 1998, and Bell filed a reply brief on May 15, 1998. It was nearly two months after the motion became ripe that Bell sought to withdraw it. Not only did Bell not continue its objection to the Court's exercise of jurisdiction, it did not even mention jurisdiction in its motion for summary judgment, a motion by which Bell asked the Court to resolve the dispute in its favor. The policy behind Rule 12(h) and the doctrine of waiver is to "expedite and simplify the proceedings." *Yeldell,* 913 F.2d at 539. By forcing Roberts to defend the merits of his claim against a motion for summary judgment, without even mentioning, much less arguing the jurisdictional challenge, Bell defeated this policy. The Court finds that Bell's conduct in these proceedings amounted to a failure to continue its objection to the Court's jurisdiction, and thus, it waived the defense of lack of personal jurisdiction.

■■■ Even if Bell had not waived this defense, the Court would still deny its motion to dismiss for lack of personal jurisdiction. Sufficient evidence has been presented that Bell purposefully delivered its asbestos into the stream of commerce, by transferring it to various manufacturers

and distributors with the expectation that it would reach Indiana. For example, Roberts submitted copies of invoices, bills of lading, work orders and work completion reports indicating that Atlas Asbestos Company, a division of Bell Asbestos Mines Ltd., sold and shipped quantities of asbestos-containing products to one of Roberts' employers, A.C. and S., Inc., for use at the Cummins Engine site at which Roberts worked. Plf's Supplemental Exs. 1, 2; Ex. 5. There is also evidence that Bell sold and shipped asbestos products directly to WorldBestos Co. in New Castle, Indiana, during the time when Roberts worked for A.C. and S., Inc. Plf's Ex. 5, 10. Roberts specifically recalled using products from Keasbey and Mattison, Atlas Asbestos and Bell Asbestos during the periods of time corresponding to the documentary evidence of sales by those entities to Indiana businesses. Plf's Ex. 5, 6, 8.

The interrelationship among these three entities has been established in other courts. The Bell asbestos mines located in Quebec, Canada, were acquired by Keasbey and Mattison Company in 1906, a company that was subsequently purchased by Turner and Newall Ltd. in 1934. *See* Plf's Ex. 12, BELL ASBESTOS MINES LTD., 1878–1967, by George W. Smith, at 12; *see also McDaniel v. Armstrong World Indus.*, 603 F.Supp. 1337, 1339–40 (D.D.C.1985). Throughout the time it owned the Bell mines, Keasbey and Mattison advertised its asbestos-containing products in Sweet's Engineering Catalogues, a nationally-distributed catalogue service. Plf's Ex. 1. In those advertisements, Keasbey and Mattison specifically extolled the quality of its asbestos textiles as "manufactured from the best quality asbestos fibre obtained from our own asbestos mines in Canada." Plf's Ex. 1, 1934 Sweet's Catalogue at 717. One of those mines was the Bell mines.

Turner and Newall Ltd. formed Bell Asbestos Mines Ltd. in 1936 to operate the Bell mines, while Keasbey and Mattison continued to manufacture and distribute a wide-range of asbestos-containing products throughout the United States. *McDaniel,* 603 F.Supp. at 1340. It used Bell asbestos in its products. In essence, as it told its shareholders in 1950, Turner and Newall had created a distribution chain "so firmly entrenched that ... [it embraced] all the major trading areas of the nation...." *Id.* 1339–40 (quoting from a Turner and Newall brochure). Bell employed that chain to distribute its asbestos to all those trading areas. One link of the chain, Keasbey and Mattison, held an exclusive license to distribute a product known as sprayed Limpet asbestos. *Id.* That product was manufactured by Atlas Asbestos Co., which became an internal division of Bell's in 1963 and manufactured products using Bell's asbestos. Plf's Ex. 12 at 14. Atlas' advertising materials promoted the connection between its products and the asbestos from Bell's mines, which it touted as "high grade asbestos fibre." Plf's Ex. 4; Plf's Ex. 9, Copy of Atlas' Trademark Registration for Limpet Asbestos Fibre. Roberts specifically testified to using Limpet as well as other Atlas products. Plf's Ex. 5.

The evidence shows that Bell's asbestos was being distributed through the chain created by its parent company, Turner and Newall, to all major markets in the United States, including Indiana. Moreover, this Court has in the past found that Bell "repeatedly delivered its asbestos into the stream of commerce with the expectation that it would reach the Indiana market." *Ford v. Johns–Manville Sales Corp.*, 662 F.Supp. 930, 933 (S.D.Ind.1987). Therefore, the Court finds the evidence submitted by Roberts adequate to establish minimum contacts between Bell and the state of Indiana via the distribution of its product, such that the exercise of jurisdiction over Bell in this products liability action satisfies due process.

Bell further argues that all sales of Bell asbestos were made "f.o.b. Thetford Mines, Quebec," and that consequently the purchaser assumed control of the product in Canada and independently decided

where it would go from there. This argument has failed to overcome the exercise of personal jurisdiction in past cases decided in this Circuit and others. For example, in *Renner v. Lanard Toys Ltd.*, the Third Circuit wrote that "absence of direct sales or shipments into the forum is not dispositive." 33 F.3d 277, 282 (3d Cir.1994). In fact, the court noted that nothing in *World–Wide Volkswagen* "suggests that the fact that a foreign manufacturer or seller rids itself of title by a sale F.O.B. a foreign port is enough to insulate that manufacturer or seller from jurisdiction." *Renner*, 33 F.3d at 282. Instead, the court need only find that the manufacturer introduced its product into the stream of commerce with the expectation it would reach the forum state. *Id.* Personal jurisdiction does not depend on a mechanical or formalistic test, such as where title passes, but on a practical and realistic approach to determining the purpose of a defendant's conduct. *See North Am. Philips v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579–80 (C.A.Fed.(Ill.)1994) (no policy would be furthered by according "controlling significance" to the passage of legal title). The appearance of Bell's asbestos in this state was not random or fortuitous, but was the result of a conscious effort by Bell to exploit a chain of distribution so entrenched that it embraced all of the major trading areas of the United States, including Indiana.

■ In addition to the evidence that Bell's asbestos was distributed in Indiana, there was sufficient evidence of Roberts' exposure to that asbestos for the jury to find in his favor. This means that Roberts' claim arose out of the contacts between Bell and the forum state, which are sufficient minimum contacts for the Court to exercise personal jurisdiction over Bell. The exercise of that jurisdiction would not offend traditional notions of fair play and substantial justice because Bell is responsible for a product being introduced into Indiana that is hazardous to the health of Indiana's citizens. Roberts is an Indiana citizen, and the damage to his health occurred in this state. While it may be inconvenient for Bell to litigate in a foreign jurisdiction, that inconvenience does not outweigh Indiana's substantial interests in applying its product liability laws to an action by one of its citizens who was harmed by a product made outside the state and introduced by the defendant into the state. As this Court stands in the shoes of an Indiana court in a diversity case, it assumes responsibility for protecting that interest.

Finally, Roberts was injured and received medical care in this state, which means that his medical records and witnesses are located here. Moreover, the judicial system's interest in obtaining the most efficient resolution of controversies is best served by allowing Roberts to litigate his product liability claim against Bell together with his claims against all of the other defendants alleged to have introduced asbestos fibers into Roberts' various workplaces. For all of these reasons, the Court finds that even if Bell had not waived its objection to the exercise of personal jurisdiction, the requirements of due process do not preclude the Court from exercising jurisdiction over this non-resident defendant corporation.

## II. SUBJECT MATTER JURISDICTION

■ With respect to the alleged lack of subject matter jurisdiction, the Court finds that Bell has failed to demonstrate that any aspect of international law would require a federal court in the United States to comply with a statute in a foreign state that restricts jurisdiction over asbestos-related claims exclusively to courts in that foreign country. Bell argues that because it is incorporated under the laws of Quebec, Canada, it is subject to the jurisdiction of the Civil Code of Quebec. Bell's Motion to Dis., Ex. A, Dufour Aff. ¶ 4. Articles 3129 and 3151 of that Code provide that the courts of Quebec have "exclusive jurisdiction for all civil claims arising

from damages suffered as a result of exposure of an individual to asbestos fiber which originates in Quebec." *Id.* ¶ 6. From these provisions, Bell concludes that this Court does not have subject matter jurisdiction over Roberts' claim against it.

Bell cites no treaty between the United States and Canada that would abrogate this country's sovereignty as it relates to protecting its citizens from injuries caused by asbestos mined, milled or manufactured in Quebec. Absent such an agreement, the United States maintains its sovereignty and corresponding jurisdiction. The Constitution describes the jurisdiction of federal courts as extending "to Controversies ... between a State, or the citizens thereof, and foreign States, Citizens or Subjects." U.S. CONST. ART. III, § 2. Congress reinforced that jurisdictional grant when it established the diversity jurisdiction of the federal courts. *See* 28 U.S.C. § 1332 ("district courts shall have original jurisdiction of all civil actions where the matter in controversy ... is between ... citizens of a State and citizens or subjects of a foreign state. . . ."). It is from these laws that this Court derives its subject matter jurisdiction over Roberts' claim.

The Federal Sovereign Immunities Act denies Canada the right to sovereign immunity for actions against it that arise out of commercial activities or torts that affect United States citizens. *See* 28 U.S.C. § 1602 ("under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned"). That Act provides general immunity from the jurisdiction of United States' courts for foreign states, subject to existing international agreements and the exceptions specified in the Act. 28 U.S.C. § 1604. One of those exceptions is when an action is based on commercial activity carried on in the United States by the foreign state, and another is when the action is for money damages sought against the foreign state for personal injury or death. 28 U.S.C. § 1605.

These provisions demonstrate that Canada itself cannot avoid the jurisdiction of United States' courts over actions arising from injuries caused by it to United States citizens. It would follow that Canada does not have the power to immunize its corporate citizens from such suits, absent a treaty allowing such immunization. Therefore, this Court has subject matter jurisdiction over the action against Bell, notwithstanding Quebec's statutes to the contrary.

### III. MOTION TO STRIKE ROBERTS' CLAIM FOR COSTS

On August 27, 1998, Roberts submitted a verified motion for entry of judgment on the jury verdict awarding him $150,000.00 against defendant Bell. In the motion, Roberts reported that prior to the verdict he had obtained settlements from other defendants and non-parties totaling $69,-750.00. He also requested $1,125.45 in costs pursuant to 28 U.S.C. § 1920 and Rule 54(d). Consequently, Roberts asked the Court to enter judgment on the verdict in the amount of $81,375.45. In response, Bell moved to strike the claim for costs as unsubstantiated, but subsequently admitted that its motion "merely sought substantiation and proof of the $1,125.45 claim for costs." Resp. of Def. Bell to Plf's Am. Cl. for Comps. Costs (hereinafter "Bell's Resp.") at 1. While gathering the documentation necessary to substantiate the $1,125.45 in costs, Roberts discovered additional compensable costs and amended his request for entry of judgment on the verdict to include those costs as well.

Specifically, Roberts has attached to his bill of costs documentation in support of a claim for the following:

1. $1,123.97 for the transcript of Dr. Fayez S. Tushan's deposition;

2. $293.75 for videotaping Dr. Tushan's deposition;

3. $2,275.00 for the expert witness fee for Dr. Tushan;

4. $1,507.50 for the transcript of Roberts' deposition;

5. $150.00 for court filing fee; and

6. $2,160.42 and $1,318.60 for copying expenses of both of Roberts' law firms. Plf's Am. Cl. for Comp. Costs and Mot. for Entry of J. on the Verd. at 2. As a result of the revised claim for costs, Roberts seeks the entry of judgment in the amount of $89,079.24. *Id.* at 3.

■ Rule 54(d) of the Federal Rules of Civil Procedure states, "Costs shall be allowed as of course to the prevailing party unless the court otherwise directs." A federal court, pursuant to 28 U.S.C. § 1920, may tax the following as costs:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of the court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

This rule creates a presumption that the prevailing party will recover all authorized costs, subject to the district court's discretion to direct otherwise. 6 James W. Moore *et al.*, MOORE'S FEDERAL PRACTICE ¶ 54.71[2] (2d ed.1988); *see Delta Air Lines v. August*, 450 U.S. 346, 352, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981) (stating that costs are usually assessed against the losing party); *Finchum v. Ford Motor Co.*,

57 F.3d 526, 533 (7th Cir.1995). The presumption is strong and difficult to overcome. *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir.1997); *Congregation of the Passion v. Touche, Ross & Co.*, 854 F.2d 219, 222 (7th Cir. 1988).

■ The Supreme Court, in a case involving an award of attorneys' fees, defined a "prevailing party"[1] as one who "succeed[s] on any significant issue in litigation which achieves some of the benefit ... sought in bringing the suit." *Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Using this standard, the Court finds that Roberts is a prevailing party in this litigation.

■ Just as Rule 54(d) affords discretion to award full costs to a party achieving limited success, it also permits the court to deny costs to the "prevailing" party under certain circumstances. Those circumstances include when there is a showing of bad faith or misconduct by the prevailing party during litigation,[2] or the losing party is unable to pay, or when the loser challenges the necessity, validity or propriety of a claimed cost. *See Congregation of the Passion v. Touche, Ross & Co.*, 854 F.2d 219, 222 (7th Cir.1988). Unless the losing party affirmatively demonstrates that the prevailing party is not entitled to costs, the district court must award them "as of course." *Id.* When and if the loser objects, the district court has the opportunity to determine if, or how

---

**1.** Although the *Texas Teachers* case defined "prevailing party" in an attorney fee context, the Court has emphasized that the definition of "prevailing party" does not differ from rule to rule or statute to statute. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1933). In fact, the Court has specifically stated that the prevailing party standards "are generally applicable in all cases" where a "prevailing party" may be entitled to an award. *Id.* at 433 n. 7, 103

S.Ct. 1933. The definition for "prevailing party" articulated by the *Hensley* Court, therefore, applies equally to Rule 54(d).

**2.** Examples of the type of misconduct that will justify the denial of costs include, the unnecessary calling of witnesses, raising unnecessary issues, or otherwise inappropriately prolonging the proceedings. *See Congregation of the Passion*, 854 F.2d at 222.

much of, the claimed costs are properly compensated. *Id.; Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Manufacturing Co.,* 924 F.2d 633, 642 (7th Cir.1991) (district courts enjoy wide discretion in determining and awarding reasonable costs). If it finds that the prevailing party is entitled to something less than full costs, the court must articulate its reasons for reducing the amounts. *Coyne–Delany Co. v. Capital Dev. Bd. of the State of Illinois,* 717 F.2d 385, 392 (7th Cir.1983). The explanation must include a determination of whether a given expense is an allowable cost item and if the amounts are reasonable and necessary. *Northbrook Excess,* 924 F.2d at 642.

 Bell has objected to all of Roberts' cost items except for the filing fee.[3] The Court will address each objection in turn. First, with respect to the costs attributable to a transcript and videotape of Dr. Tushan's deposition, the Court finds that those amounts fall within the scope of fees of the court reporter for the stenographic transcript. *See* 28 U.S.C. § 1920(3). As other courts have noted, § 1920(3) is interpreted in light of Rule 30 of the federal rules of procedure, which allows for the recording of deposition testimony by non-stenographic means. *See Commercial Credit Equip. Corp. v. Stamps,* 920 F.2d 1361, 1368 (7th Cir.1990) (noting that Fed. R.Civ.P. 30(b)(4) allows the parties to stipulate to recording deposition by other than stenographic means). The *Commercial Credit* court affirmed the taxation of costs associated with a videotaped deposition "as a substitute for stenographic transcript, even though it is more expensive." *Id.* at 1368–69. That court also agreed with the defendant that stenographic transcripts of the videotaped depositions were necessary for trial preparation, but held that it could not tax the cost of such transcripts because Rule 30(b)(4) contained an express

provision that a party may arrange for such transcripts at his or her own expense. *Id.* at 1369. For that reason, the court denied an award of costs for the stenographic transcripts of the videotaped depositions.

In 1993, Rule 30 of the federal procedural rules was amended, and the language cited by the *Commercial Credit* court was deleted. *See* Fed.R.Civ.P. 30(b)(2) ("Any party may arrange for a transcription to be made from the recording of a deposition taken by non-stenographic means"). Consequently, courts have now allowed the taxing of costs for both the videotaping and the stenographic transcription of a deposition, provided that both were necessarily obtained for use in the case. *See Tilton v. Capital Cities/ABC, Inc.,* 115 F.3d 1471, 1478 (10th Cir.1997); *Garonzik v. Whitman Diner,* 910 F.Supp. 167, 171 (D.N.J.1995) (collecting cases and noting change in Rule 30(b)); *see also Karsian v. Inter–Regional Fin. Group, Inc.,* 13 F.Supp.2d 1085, 1088 (D.Colo.1998).

Here, Roberts took the deposition of his pulmonologist, Dr. Tushan, thinking that the doctor would be unavailable for testimony at trial. That deposition was recorded both by videotape and by stenographic means, and Roberts has submitted a request for the taxation of costs for both items of expense. As a medical doctor, Dr. Tushan's testimony was necessary both as Roberts' treating physician and as an expert on the causes of pulmonary diseases. Consequently, Roberts was required by Rule 26(a) to provide the defendants with a transcript of any portions of Dr. Tushan's videotaped deposition that may be used as evidence at trial. Fed. R.Civ.P. 26(a)(3)(B). Although Dr. Tushan subsequently testified in person at Roberts' trial, there is no evidence that Roberts knew at the time of the deposition

---

**3.** With respect to that fee, however, Bell properly noted that the amount claimed in the bill of costs does not coincide with the amount reported in the supporting documentation.

Given that, the Court will award as a taxable cost the amount in the documentation, or $120.00.

that the doctor would be available for the trial.

A deposition does not need to be actually introduced as a trial exhibit for it to be considered necessarily obtained for use in the case. *See NLFC, Inc. v. Devcom Mid–America, Inc.,* 916 F.Supp. 751, 763–64 (N.D.Ill.1996) (citing *Hudson v. Nabisco Brands, Inc.,* 758 F.2d 1237, 1243 (7th Cir.1985)). Moreover, the "determination of necessity must be made in light of the facts known at the time of the deposition." *Id.* at 764. Given that Roberts was unsure of his doctor's availability for trial testimony at the time his deposition was taken, the Court finds that the recording of the doctor's deposition by videotape qualifies as a necessary cost of trial preparation. Because Dr. Tushan was being offered as an expert witness, it was also necessary to obtain a stenographic transcript of the videotaped deposition. The costs claimed for the videotaping and the stenographic transcription are reasonable and will be awarded to Roberts as part of his compensable costs. Therefore, the Court will award Roberts a total of $3,692.72 for these expenses.

■ Next, Bell objects to the amount of costs asserted as expert witness fees for Dr. Tushan, arguing that the only costs recoverable for this item are limited by the statutory per diem rate for witness expenses. Bell is correct. *See* 28 U.S.C. § 1821; *NLFC, Inc.,* 916 F.Supp. at 764; *Andrews v. Suzuki Motor Co., Ltd.,* 161 F.R.D. 383, 385 (S.D.Ind.1995) (citing *Chicago College of Osteopathic Med. v. George A. Fuller Co.,* 801 F.2d 908 (7th Cir.1986)). "The correct standard for taxing expert fees is not the amount the expert charged the party," unless the expert was appointed by the court. *NLFC, Inc.,* 916 F.Supp. at 764. Rather, it is the amount allowed by the statute setting a per diem rate for witnesses in attendance at any court or for a deposition. *Chicago Coll. of Osteo. Med.,* 801 F.2d at 910 (expert witnesses are treated no differently by § 1821 than fact witnesses). The current rate for attendance of a witness is forty dollars a day. 28 U.S.C. § 1821(b). Dr. Tushan charged Roberts $2,275.00 for his services in connection with this litigation, which represented $350.00 per hour for six and one-half hours. Those hours did not include the time Dr. Tushan testified during the trial. Thus, the Court finds that Roberts should be awarded costs in the amount of $40.00 per day for the two days that his expert witness attended his deposition and the trial, or a total of $80.00.

■ The third item of expenses to which Bell objected is the "transcript" of the deposition of the plaintiff, William Lee Roberts. That deposition was taken in April and May of 1997, and the trial was held in August of 1998. It was recorded by videotape, and Roberts asks to be awarded costs equal to the expense of that videotaping. Bell's primary objections are that the costs associated with Roberts' videotaped deposition should be divided among all seven defendants in this action, and that the videotape was "neither used, nor necessary, in the trial of Roberts' case." Bell's Resp. at 5–6. With respect to the first objection, Bell is the defendant who litigated this action all the way to a jury trial and then lost. Therefore, it is the only defendant that will be taxed with the cost of the deposition transcript. By settling with Roberts prior to the trial, the other defendants limited the extent of their liability to the settlement amounts. The second objection must similarly be overruled. Roberts' poor health provided ample justification for videotaping his deposition in anticipation of his possible unavailability as a witness at trial. As it happened, Roberts was unable to testify at trial because of his health. Instead, his testimony was offered via the transcript of his deposition. Unlike with Dr. Tushan's deposition expenses, Roberts is only seeking costs for one means of recording his deposition, videotaping. The Court finds that it was both reasonable and necessary for trial preparation to have videotaped Roberts in 1997, in anticipation of his pos-

sible non-attendance at the trial. The Court notes, however, that a charge of $25.50 was included in the videotaping bill, which charge is not allowed under § 1920. Therefore, the corrected amount of $1,482.00 will be awarded for the costs associated with recording Roberts' deposition.

 Finally, the copying charges Roberts claims as allowable costs cannot be awarded. As Bell points out, there is no indication in any of the documentation of the purpose for any of the copies. This means the Court is not able to make the necessary findings in order to determine if the copies were "necessarily obtained for use in the case." Roberts failed to identify any of the documents that were copied, the number of copies made of each document, or the cost for each copy. A party seeking costs for copying must provide the court with at least that level of breakdown of the copying charges to enable it to make the necessary determinations. *See NLFC, Inc.*, 916 F.Supp. at 763. Roberts' first bill of costs failed to provide any substantiation of the amounts claimed for copying charges and the Court has allowed him to amend that bill of costs. The amended bill of costs continues to lack sufficient information to permit the Court to determine whether to allow the copying charges. The burden of providing such information was on Roberts. Therefore, the copying costs sought by Roberts will be disallowed.

In sum, the Court will allow the taxation of costs for the following items:

1. $1,123.97 for the transcript of Dr. Fayez S. Tushan's deposition;

2. $293.75 for videotaping Dr. Tushan's deposition;

3. $80.00 for the witness attendance fee for Dr. Tushan;

4. $1,482.00 for the transcript of Roberts' deposition;

5. $120.00 for the filing fee; and

6. $00.00 for the copying expenses of both of Roberts' law firms.

This brings the total award of costs for Roberts to $3,099.72.

## IV. MOTIONS RELATING TO ENTRY OF JUDGMENT

 On more than one occasion, Bell has moved the Court to compel Roberts to disclose the identity of the entities who paid settlements to him as a result of this action, as well as the amount each entity paid. Bell claims this information is necessary for purposes of applying a credit, or set-off, to the judgment amount to be entered on the jury verdict. Roberts opposes such disclosures, arguing that the information is not relevant to determining the proper amount of credit as long as the total amount recovered from all settlements has been disclosed. He also contends that the terms of his settlement agreements with the other parties and non-parties prohibit him from revealing this confidential information. In its most recent pleading directed at obtaining this information, Bell maintains that both "common sense" and the "common law" dictate that Bell is entitled to information about the "derivation of plaintiff's credit calculation" and the "identity of the entities from whom such monies were received." Bell's Consol. Resp. to Plf's Sealed Submission at 2. Despite this appeal to the common law, Bell has failed to cite this Court to any authority that would authorize or mandate the disclosure of the requested information under these circumstances.

On the contrary, the Court finds that such disclosure would be inconsistent with the policy of promoting settlements among litigants. *See Grove Fresh Dist., Inc. v. John Labatt Ltd.*, 888 F.Supp. 1427, 1441 (N.D.Ill.1995), *aff'd* 134 F.3d 374, *cert. denied* 525 U.S. 877, 119 S.Ct. 180, 142 L.Ed.2d 147 (1998), (citing *City of Hartford v. Chase*, 942 F.2d 130, 135–36 (2d Cir.1991)). "[W]hile there is simply no legitimate public interest to be served by disclosing settlement agreements, the parties to the agreement are likely to have a

compelling interest in keeping the settlement amount confidential." *Id.* (quotations omitted). Keeping settlement agreements confidential will serve the interests of both the public and the parties, because it will advance the "strong public interest in, and policy objectives furthered by, promoting settlement." *Id.* Consequently, courts should "honor confidentialities that are bargained-for elements of settlement agreements." *Id.*

Roberts submitted a verified motion containing the total amount he has received in settlement from others, and the Court has no reason to doubt the validity of that amount. It is the total amount received that will offset the judgment on the jury's verdict, which means a detailed summary of which entity gave what would not be relevant for this purpose. For these reasons, and because the Court finds that Roberts' Verified Motion for Entry of Judgment on the Verdict suffices to establish the total amount of settlements that he received from other parties and non-parties, the Court **DENIES** Bell's motions to compel Roberts to identify the entities with whom and amounts by which he settled his claims. Bell's Motion for Application of Credit and/or Set-off Against Judgment is **GRANTED,** as is Roberts' motion for the entry of judgment on the jury verdict. The Court orders that the amount of $69,750.00 be set-off against the judgment to be entered on Roberts' jury verdict of $150,000.00.

### V. CONCLUSION

After considering all of the arguments and evidence in support of Bell's motion to dismiss for lack of personal and subject matter jurisdiction, the Court has found no merit in either defense and the motion to dismiss is **DENIED.** On August 6, 1998, a jury returned a verdict for Roberts and against Bell in the amount of $150,000.00, and the Court now directs the entry of judgment on that verdict, as modified to reflect the set-off for prior settlement amounts paid to Roberts and the award of

taxable costs. The costs to be awarded to Roberts are $3,099.72, which amount must be added to the amount of damages awarded by the jury, and the set-off is $69,-750.00, which amount must be deducted from that jury award. Therefore, the total amount to be awarded in the final entry of judgment for Roberts is $83,349.72.